342 S.E.2d 73

**Frederick H. DELLER and Jerri Deller**

v.

**George NAYMICK, M.D.**

**No. CC950.**

Supreme Court of Appeals of
West Virginia.

Nov. 21, 1985.
Dissenting Opinion April 4, 1986.

Barry M. Hill, Zagulaa & Hill, Weirton, for appellants.

Carl N. Frankovitch, Frankovitch & Anetakis, Weirton, William C. Gallagher, O'Brian, Cassidy & Gallagher, Wheeling, for appellee.

McHUGH, Justice:

This case is before this Court upon certified questions from the Circuit Court of Hancock County, West Virginia. It presents questions as to the applicability of coemployee immunity to a doctor employed by a subscriber to the Workers' Compensation Fund or by a self-insured employer and the effect, if any, of the carrying of liability insurance on such immunity.

Frederick H. Deller, one of the plaintiffs herein [1] [hereinafter, "the injured employee"], suffered a minor knee injury in the course of and resulting from employment with Weirton Steel Division of National Steel Corporation,[2] [hereinafter, "the employer"]. The injured employee was immediately treated at the employer's dispensary for the job-related injury by the defendant, George Naymick, M.D., a duly licensed physician [hereinafter, "the doctor"]. The doctor worked, as a salaried employee, eight hours a day, Monday through Friday, at the employer's dispensary. The dispensary for employees was staffed by the doctor; the medical director (a physician) who supervised him; one other full-time and one part-time physician; and 16 nurses (normally six of whom worked day shift). The doctor was also employed as a physician for an hour a day, two days a week, by another manufacturing company. He also had a limited private

1. Mrs. Jerri Deller, wife of Frederick H. Deller, joined in the action to recover for loss of consortium.

2. The name of the employer is now Weirton Steel Corporation.

practice while not acting as a doctor for the two companies.

The injured employee later received workers' compensation for the knee injury. Thereafter, the injured employee brought this medical malpractice action against the doctor, alleging that the doctor had re-used the same hypodermic syringe on at least five occasions, causing osteomyelitis of the knee. The injured employee did not include the employer as a defendant.

Upon deposition the doctor admitted that, in a medical sense, a physician/patient relationship arises when he performs his medical services for the employer, and that, although the employer has the right to administrative supervision over him, he is not subject to the employer's control professionally. He has his own medical malpractice insurance, and the employer has liability insurance. Both of these policies expressly exclude coverage, though, when workers' compensation is applicable to compensate the person injured.

The doctor's motion, under Rule 12(b)(6), *W. Va. R. Civ. P.*, to dismiss the complaint for failure to state a claim upon which relief can be granted was denied by the trial court. The motion to dismiss was based upon the alleged immunity from suit provided by *W. Va. Code*, 23–2–6a [1949].[3] Upon the joint motion of the parties the

trial court certified two questions to this Court (paraphrased by us):[4]

(1) is a full-time, salaried doctor employed by a subscriber to the Workers' Compensation Fund or by a self-insured employer[5] subject to a coemployee's medical malpractice action, because of the "dual capacity" doctrine, despite the provisions of *W. Va. Code*, 23–2–6a [1949]?

(2) is the immunity from tort liability provided by *W. Va. Code*, 23–2–6a [1949] inapplicable to the extent that the doctor employed by a subscriber to the Workers' Compensation Fund or by a self-insured employer is covered by liability insurance?

The trial court answered the first question negatively but answered the second question affirmatively. We agree with the first conclusion but disagree with the second conclusion.

## I. *Coemployee Immunity*

"The Workmen's [Workers'] Compensation Act was designed to remove *negligently* caused industrial accidents from the common law tort system." *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 700, 246 S.E.2d 907, 911 (1978) (emphasis in original). "The benefits of this [statutory] system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the

---

3. *W. Va. Code*, 23–2–6a [1949] provides: "The immunity from liability set out in the preceding section shall extend to every officer, manager, agent, representative or employee of such employer when he is acting in furtherance of the employer's business and does not inflict an injury with deliberate intention."

*W. Va. Code*, 23–2–6 [1974] provides:

Any employer subject to this chapter who shall subscribe and pay into the workmen's [workers'] compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter. The continuation in the service of such employer shall be deemed a waiver by the employee and by the parents of any minor employee of the right of action as

aforesaid, which the employee or his or her parents would otherwise have: Provided, that in case of employers not required by this chapter to subscribe and pay premiums into the workmen's [workers'] compensation fund, the injured employee has remained in such employer's service with notice that his employer has elected to pay into the workmen's [workers'] compensation fund the premiums provided by this chapter, or has elected to make direct payments as aforesaid.

4. The questions were certified pursuant to *W. Va. Code*, 58–5–2 [1967] and *W. Va. R. App. P.* 13.

5. By "self-insured employer" we refer to an employer who, pursuant to *W. Va. Code*, 23–2–9 [1984], elects to make direct payments of compensation in lieu of subscribing to the Workers' Compensation Fund. Such an employer is also immunized from tort liability by *W. Va. Code*, 23–2–6 [1974] when not in default in payments and otherwise complies with the Workers' Compensation Act.

employee, who is assured prompt payment of benefits." *Meadows v. Lewis,* 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983). Workers' compensation is the exclusive remedy against a coemployee when he acts in furtherance of the employer's business and does not inflict an injury with deliberate intention. *See W.Va.Code,* 23–2–6a [1949], *supra,* n. 3.

■ The immunity from tort liability provided by *W.Va.Code,* 23–2–6a [1949] to, among others, coemployees is the same as the immunity from tort liability provided by *W.Va.Code,* 23–2–6 [1974] to an employer. *See Bennett v. Buckner,* 150 W.Va. 648, 654, 149 S.E.2d 201, 205 (1966). This statutory immunity of a coemployee is not violative of the due process provisions of the State and Federal Constitutions because, like the employer, a coemployee is involved in a compromise of rights; among employees, the *quid pro quo* is that each employee surrenders his common law right to bring tort actions against other employees in return for immunity to their tort suits. *See Crawford v. Parsons,* 141 W.Va. 752, 759, 92 S.E.2d 913, 917 (1956). Moreover, a person may be a coemployee, for the purpose of immunity under *W.Va.Code,* 23–2–6a [1949], even though he is employed to perform a different task in a different place than the injured employee. *See Bennett v. Buckner, supra,* 150 W.Va. at 652, 149 S.E.2d at 203.

*W.Va.Code,* 23–2–6a [1949] applies when the person causing the injury to or the death of an employee (1) is an officer, manager, agent, representative or employee of the employer; (2) is acting in furtherance of the employer's business; and (3) does not inflict an injury with deliberate intention. In this case there is no allegation of deliberate intention; instead, there is an allegation of negligence. The other two requirements for statutory immunity from liability are met in this case.

■ The doctor herein is an "employee." *W.Va.Code,* 23–2–1a [1975] [6] contains the comprehensive statutory definition of "employees" for purposes of workers' compensation. " 'Employee,' the term used in our statute [*W.Va.Code,* 23–2–1a [1975]], is a broader term than 'workman' ['worker'] and is applicable to all persons in the service of the employer. [citation omitted] The breadth of the term may be limited by statutory exception." *West Virginia Coal & Coke Corp. v. State Compensation Commissioner,* 116 W.Va. 701, 704, 182 S.E. 826, 828 (1935). Ordinarily, a member of a profession is not considered to be an "employee," within the meaning of workers' compensation laws, because he usually provides his services for a limited purpose and only for particular transactions. *Id.,* 116 W.Va. at 704, 182 S.E. at 827–28. On the other hand, a professional person is an "employee" for workers' compensation purposes when he or she provides his or her services "to an employer largely to the exclusion of otherwise special employment, for a certain fixed and determined period, at a regular salary, and hold[s] [himself or herself] in readiness at all times to serve [his or her] employer[.]" *Id.,* 116 W.Va. at 704, 182 S.E. at 828. Such is the case here. *West Virginia Coal & Coke, supra,* contains this holding in syllabus point 3:

> Where there is a contract of employment between a physician and a subscriber to the Workmen's [Workers'] Compensation Fund whereby the physician, for stipulated remuneration, undertakes to render professional service to employees of such subscriber for a definite period, and places his services and professional ability at the call of his employer, the physician will be considered an employee

6. *W.Va.Code,* 23–2–1a [1975] provides in pertinent part:

> Employees subject to this chapter are all persons in the service of employers and employed by them for the purpose of carrying on the industry, business, service or work in which they are engaged, including, but not limited to ... every executive officer of an association or of a corporation elected or ap-

> pointed in accordance with the charter and bylaws of the association or corporation, every person in the service of the State or of any political subdivision or agency thereof, under any contract of hire, express or implied, and every official or officer thereof, whether elected or appointed, while performing his official duties, ...

within the meaning of the Workmen's [Workers'] Compensation Act.

■ In addition to being an "employee" for the purpose of immunity from liability under *W.Va.Code*, 23–2–6a [1949], the doctor herein was "acting in furtherance of the employer's business" at the time in question as provided by such statute. "[The doctor's] services, which were rendered in furtherance of the employer's business, under express authority of the employer, . . ., are the employer's acts." *Hinkelman v. Wheeling Steel Corp.*, 114 W.Va. 269, 270, 171 S.E. 538, 539 (1933).[7] The sole syllabus point of *Hinkelman* is controlling here:

> If a doctor, who is employed by a subscriber to the Workmen's [Workers'] Compensation Fund to render medical and surgical aid and treatment to its employees, is so unskil[l]ful and negligent in his treatment of an employee, injured in the course of and resulting from his employment, that the injury is aggravated thereby, such action on the part of the doctor comes within the [Workers'] Compensation Act. Therefore, under such a state of facts, an action is not maintainable against the doctor.

The lead opinion in *Jones v. Laird Foundation, Inc.*, 156 W.Va. 479, 484, 195 S.E.2d 821, 825 (1973), involving a non-employee doctor's aggravation of a workers' compensable injury, recognizes that "[s]ince this last extension of immunity in 1949 [by *W.Va.Code*, 23–2–6a], the total statutory grant of [coemployee] immunity

is clear and unambiguous." Being clear and unambiguous, the legislative intent expressed in this statute should be applied and not construed. " 'Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' Syl. pt. 1, *State v. Warner*, 172 W.Va. 502, 308 S.E.2d 142 (1983)." Syl. pt. 1, *State v. Highland*, 174 W.Va. 525, 327 S.E.2d 703 (1985). "That the parties disagree as to the meaning or the applicability of [a statutory] provision does not of itself render [the] provision ambiguous or of doubtful, uncertain or obscure meaning." *Estate of Resseger v. Battle*, 152 W.Va. 216, 220, 161 S.E.2d 257, 260 (1968). "Rules of interpretation are resorted to for the purpose of resolving an ambiguity, not for the purpose of creating it." *Crockett v. Andrews*, 153 W.Va. 714, 719, 172 S.E.2d 384, 387 (1970).

Thus, the doctor is clearly immunized from liability under the terms of *W.Va. Code*, 23–2–6a [1949]. Nothing stated in this opinion would preclude the legislature from enacting a statute on the basis of an exception to coemployee immunity which would subject doctors or other "professional" employees to tort liability.[8]

The injured employee in the case now before this Court invites us to carve out an exception to the statutory coemployee immunity from tort liability based upon the "dual capacity" doctrine. We decline the invitation.

■ The so-called "dual capacity" doctrine or "dual *persona* " doctrine has been

---

7. *Hinkelman v. Wheeling Steel Corp.*, 114 W.Va. 269, 171 S.E. 538 (1933), involving an employee doctor, was decided more than 15 years before *W.Va.Code*, 23–2–6a [1949] was enacted. Syl. pt. 4, *Tawney v. Kirkhart*, 130 W.Va. 550, 44 S.E.2d 634 (1947), not involving an employee doctor, expressly overruled *Hinkelman* on the basis that *W.Va.Code*, 23–2–6, as amended, immunizes only the employer and not coemployees. "At the next succeeding session of the legislature, Section 6a was enacted. It is reasonable to assume that the purpose of the legislature in enacting Section 6a was to change the rule of the Tawney case so as to extend the immunity of the employer to additional persons[,] . . . including fellow employees." *Bennett v. Buckner*, 150 W.Va. 648, 654, 149 S.E.2d

201, 204–05 (1966). The majority opinion in *Jones v. Laird Foundation, Inc.*, 156 W.Va. 479, 491, 195 S.E.2d 821, 828–29 (1973), involving a non-employee doctor's aggravation of a workers' compensable injury, notes that the enactment of *W.Va.Code*, 23–2–6a [1949] moots the *Hinkelman/Tawney* conflict over coemployee immunity. The result in *Hinkelman* (immunity) is codified.

8. *See, e.g., Wis.Stat.Ann.* § 102.29(3) (West Supp.1984–85): "Nothing in this chapter shall prevent an employe[e] from taking the compensation he or she may be entitled to under it and also maintaining a civil action against any physician, chiropractor or podiatrist for malpractice. . . ."

defined succinctly as follows: "An employer may become a third person, vulnerable to tort suit by an employee, if—and only if—he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person." 2A A. Larson, *The Law of Workmen's Compensation* § 72.81 (1983) [hereinafter, *Larson* ].[9] Note that the "dual capacity" or "dual *persona* " doctrine is applied by this definition to an employer, not to a coemployee.

When, as in this case, the suit is against a coemployee doctor, the dual capacity or dual *persona* doctrine is completely untenable. "[T]he company doctor does *not* have two capacities. He has only one: company doctor. That is the entire extent of his relation to his coemployees. All he does, all day long, is perform in this single capacity in relation to his coemployees." 2A *Larson* § 72.61(b) at 14–203 to –204 (emphasis in original). In a state whose statute immunizes coemployees from tort liability, a doctor who is employed by the same employer as the plaintiff employee is usually held to be sheltered by the exclusive-remedy provision of the workers' compensation statute. *See, e.g., Budzichowski v. Bell Telephone Co.*, 503 Pa. 160, 469 A.2d 111 (1983) (employer-employee relationship exists when doctor works at plant's medical dispensary on a full-time basis, is paid a fixed salary, and receives same fringe benefits as supervisory employees; that such doctor is not prohibited from engaging in outside practice is not by itself determinative of independent contractor status; that the particular occupation may involve such technical skill that the employer's general management is wholly incapable of supervising the details of performance is not by itself determinative of independent contractor status, especially where doctor is supervised by a medical director who is a doctor; rejecting expressly at n. 5 the applicability of dual capacity doctrine to coemployees even when such doctrine may be applicable to an employer).[10] *But see Ross v. Schubert*, 180 Ind.

**9.** After this definition is this excellent analysis by Professor Larson in the same section of his treatise:

> In this formulation, an attempt has been made to correct the looseness and overextension attending the so-called 'dual capacity' doctrine. In a sense, a single legal person may be said to have many 'capacities,' since that term has no fixed legal meaning. As a result, a few courts have stretched the doctrine so far as to destroy employer immunity whenever there was, not a separate legal person, but merely a separate relationship or theory of liability. When one considers how many such added relations an employer might have in the course of a day's work—as landowner, land occupier, products manufacturer, installer, modifier, vendor, bailor, repairman, vehicle owner, shipowner, doctor, hospital, health services provider, self-insurer, safety inspector—it is plain enough that this trend could go a long way toward demolishing the exclusive remedy principle.... [*Accord, State v. Purdy,* 601 P.2d 258, 260 (Alaska 1979) ].

> Since the term 'dual capacity' has proved to be subject to such misapplication and abuse, the only effective remedy is to jettison it altogether, and substitute the term 'dual persona doctrine.' ... The question is not one of activity, or relationship—it is one of identity. The Tennessee Supreme Court, brushing aside all the fictitious sophistry of 'dual capacity,' nailed down this point with breathtaking simplicity:

> > 'The employer is the employer; not some person other than the employer. It is [that] simple.... ['*McAlister v. Methodist Hospital,* 550 S.W.2d 240, 246 (Tenn.1977).]

> The only way a court can break through this monolithic truism is to resort to a legal fiction. And, as has been stressed at several other points in [this treatise], legal fictions have no place in the interpretation of detailed modern statutes, such as compensation acts.

**10.** *See also Young v. St. Elizabeth Hospital,* 131 Ill.App.3d 193, 86 Ill.Dec. 389, 475 N.E.2d 603 (1985) (expressly rejecting dual capacity doctrine); *Thomas v. Kenton,* 425 So.2d 396 (La.Ct. App. 3 Cir.1982); *Jones v. Bouza,* 381 Mich. 299, 160 N.W.2d 881 (1968) (rejecting argument that medical malpractice claims should be treated differently than other common-law tort claims barred by coemployee immunity statute and rejecting argument that allowing suit against independent contractor physician but denying suit against coemployee physician results in denial of equal protection); *Boyle v. Breme,* 187 N.J. Super. 129, 453 A.2d 1335 (1982), *aff'd for reasons stated below,* 93 N.J. 569, 461 A.2d 1164 (1983) (refusing to apply dual capacity doctrine; deferring to legislature to create this or any other exception to coemployee immunity); *Garcia v. Iserson,* 33 N.Y.2d 421, 353 N.Y.S.2d 955, 309 N.E.2d 420 (1974) (coemployee physician worked at employer's infirmary four hours per

App. 402, 388 N.E.2d 623 (1979) (company doctors are independent contractors, not coemployees, for the purpose of tort liability, because of their professional status and responsibilities).[11] Two states expressly apply the dual capacity doctrine to coemployee doctors.[12] *See generally* annot., 28 A.L.R.3d 1066 (1969), especially §§ 5, 10. *Cf.* annot., 23 A.L.R.4th 1151 (1983) (dual capacity doctrine as basis for recovery from employer).

The injured employee in this case argues that applying coemployee immunity to coemployee doctors would be against public policy because it would not discourage medical malpractice by coemployee doctors, to the detriment of employees' health. On the other hand, the employer in this case in its *amicus curiae* brief argues that excepting employee doctors from coemployee immunity would be against public policy because it would discourage employers from maintaining on-site dispensaries, to the detriment of employees' health. The legislature, not this Court, is the appropriate tribunal for deciding this fairly debatable issue. *See* syl. pt. 3, *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 336 S.E.2d 204 (1985). By not excepting doctors or other professional employees from *W.Va.Code*, 23–2–6a [1949] the legislature has decided the issue in favor of immunity.[13]

**11.** 2A *Larson* § 72.61(b) at 14–204 to –206 soundly criticizes the Indiana approach:

Indiana has pierced the immunity of coemployee doctors and nurses by a sort of throwback to an early common-law notion that, because of their professional responsibility, doctors must necessarily be independent contractors, bolstered by the policy argument that immunization would encourage malpractice.

The short answer to the Indiana approach is that company doctors, and nurses, like salaried lawyers, interns, and other professional persons, are now routinely held to be employees for purposes of compensation benefits, and it is unthinkable that a legislature should intend that a given person should be an employee under the act for one purpose and an independent contractors [*sic*] for another. It is no answer to this to say, as the Indiana court did, that the rule of liberal construction appropriate to determining status for benefits is not necessarily applicable in determining status for third party liability. For one thing, one does not need to invoke liberal construction to find employee status for a full-time salaried doctor or nurse; all that is needed is

to apply the routine standards of employment relation. And in any case, once a particular category of persons, like company doctors, has been placed in the employee classification, that classifications [*sic*] must govern for all purposes. This is not only simple logic and straightforward statutory construction, but also is a recognition of the policy justification for coemployee immunity in the first place. As brought out in the discussion of this policy earlier, there can be said to be a *quid pro quo* among employees, in that each gives up his common law rights against the others in return for immunity to tort suits. But, if the company doctor is not immune as a coemployee, this rationale breaks down: he loses his right to sue coemployees, while remaining liable to suit by coemployees himself. (footnotes omitted)

**12.** *Hoffman v. Rogers*, 22 Cal.App.3d 655, 99 Cal.Rptr. 455 (1972) (expressly applying dual capacity doctrine; otherwise, quackery and disregard of professional obligations would be encouraged); *Wright v. District Court*, 661 P.2d 1167 (Colo.1983) (expressly applying dual capacity doctrine; the very practice of medicine, with its special duties and responsibilities, charges a coemployee doctor with all of the obligations which normally arise in the doctor-patient relationship).

**13.** *Wright v. District Court*, 661 P.2d 1167 (Colo. 1983), *supra*, n. 12, in applying the dual capacity doctrine, discusses (at 1170–71) five purported distinctions between typical coemployees and coemployee doctors justifying tort liability exposure for the latter despite coemployee immunity provided by statute. We believe each of these is an unsound basis for our carving out an exception from coemployee immunity for coemployee doctors. First, that the injuries resulting from the coemployee doctor's medical malpractice occur away from the production area and are, therefore, easier to identify does not justify

In summary, we hold that a full-time, salaried doctor employed by a subscriber to the Workers' Compensation Fund or by a self-insured employer is immune from tort liability to a coemployee under *W. Va. Code*, 23–2–6a [1949] and that the so-called "dual capacity" or "dual *persona*" doctrine does not except such a doctor from such immunity.

## II. *Liability Insurance*

The second certified question is whether the immunity from tort liability provided by *W. Va. Code*, 23–2–6a [1949] is inapplicable to the extent that the doctor employed by a subscriber to the Workers' Compensation Fund or by a self-insured employer is covered by liability insurance. We think not.

This Court concludes that the rationale employed in *Pittsburgh Elevator Co. v. West Virginia Board of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), specifically, that the legislature had waived constitutional governmental immunity to the extent that liability insurance coverage is available, is clearly inapposite to the statutory immunity of coemployees under the Workers' Compensation Act.

As discussed in *Pittsburgh Elevator*, the purpose of governmental immunity is to protect the financial structure of the State. When, therefore, recovery is not sought from state funds but from the private funds of an insurer as the real party in interest, the rule of governmental immunity is not applicable because the reason for the rule is not implicated. In addition, to deny recovery in such a case would deny the constitutional rights to access to the courts and to redress of grievances.[14]

On the other hand, the purpose of coemployee (and employer) immunity under the Workers' Compensation Act is to replace the common-law tort claims and defenses between or among employers and employees with the no-fault, exclusive remedy of workers' compensation. Liability insurance coverage does not remove this reason for the rule, and allowing suits would emasculate the workers compensation system greatly. For example, by the same theory, any employee covered by automobile liability insurance, which coverage is usually required by *W. Va. Code*, 17D–2A–3 [1982], would be subject to suit for an injury sustained by a coemployee in a motor vehicle accident in the course of and resulting from employment.[15] Also, unlike governmental immunity (in the context of liability insurance coverage), coemployee (and employer) immunity under the Workers' Compensation Act does not result in a total denial of the right to apply for redress of grievances. Instead, the alternative workers' compensation remedies are available in lieu of the common-law remedies.[16]

In summary, we hold that the immunity from tort liability provided by

---

special treatment of coemployee doctors. The same could be said of injuries caused by an office worker at the plant. Second, medical malpractice at the company dispensary is no less an inherent risk in the *production* process than a motor vehicle accident involving employees on the company parking lot. Third, that coemployee doctors have higher income and liability insurance coverage than the "average coemployee" does not justify disparate treatment because the coemployee immunity statute does not immunize only "average employees." Fourth, that the doctor is removed from the production area and is, therefore, very unlikely to be injured does not constitute a valid distinction because the same reasoning would apply also to an office worker at the plant. Fifth, the contention that applying coemployee immunity to coemployee doctors results in the employer's not having an economic incentive to deter future medical malpractice is not well taken because this contention ignores the increased workers' compensation premium rate which would result from the employer's subsequent experiences with compensable claims. *See W. Va. Code*, 23–2–4 [1976].

14. *W. Va. Const.*, art. III, §§ 17, 16.

15. *See, e.g., Eisnaugle v. Booth*, 159 W. Va. 779, 226 S.E.2d 259 (1976), *overruled on other grounds*, syl. pt. 1, *Mandolidis v. Elkins Industries, Inc.*, 161 W. Va. 695, 246 S.E.2d 907 (1978) (employee driving his own automobile on employer's parking lot on way to work struck a coemployee who was walking to work; coemployee immunity held applicable; no intimation of waiver of such immunity to the extent of automobile liability insurance coverage).

16. We also note that the doctor's medical malpractice insurance policy and the employer's liability insurance policy both expressly exclude coverage when workers' compensation is applicable to compensate the person injured.

*W. Va. Code*, 23–2–6a [1949] is not waived to the extent that liability insurance coverage is available.

Having answered the certified questions, this case is dismissed from the docket of this Court.

Certified questions answered; case dismissed.

McGRAW, Justice, dissenting:

The "dual capacity" doctrine was first articulated by the California Supreme Court in *Duprey v. Shane*, 39 Cal.2d 781, 249 P.2d 8 (1952), which "adopted as and for the opinion of this Court" the opinion of the District Court of Appeal, First Appellate District, Division One, Presiding Justice Raymond E. Peters, in *Duprey v. Shane*, 241 P.2d 78 (Cal.Dist.Ct.App.1952). Ms. Duprey was employed as a nurse by a partnership which practiced chiropractic medicine when she was injured while handling a patient. 39 Cal.2d at 785, 249 P.2d at 11. She was treated by Dr. Shane, one of the partners, and by Dr. Harrison, an employee of the partnership. *Id.* As the proximate result of negligent medical treatment by Dr. Shane and Dr. Harrison, Ms. Duprey's initial injury was substantially aggravated. 39 Cal.2d at 785–87, 249 P.2d at 12. Confronted with the exclusivity provision of the workers' compensation system from which she had already recovered, the court stated:

> "There seems to be no logical reason why the employer-doctor, when he undertakes to treat the industrial injury, should not be responsible in a civil trial action for his negligent acts in treating that injury.... In such event, the employer-doctor is a 'person other than the employer' within the meaning of section 3852 of the Labor Code above quoted. In treating the injury Dr. Shane did not do so because of the employer-employee relationship, but did so as an attending doctor, and his relationship to * * * [plaintiff] was that of doctor and patient."

39 Cal.2d at 793, 249 P.2d at 15. Accordingly, the court held:

> "[I]t is perfectly apparent that the person involved—Dr. Shane—bore towards his employee two relationships—that of employer and that of doctor—there should be no hesitancy in recognizing this fact as a fact. Such a conclusion, in this case, is in precise accord with the facts and is realistic and not legalistic. We conclude, therefore, that an employee injured in an industrial accident may sue the attending physician for malpractice if the original injury is aggravated as a result of the doctor's negligence, and that such right exists whether the attending doctor is the insurance doctor or the employer."

39 Cal.2d at 793, 249 P.2d at 15. Consistent with this rationale, the court held, with respect to the liability of Dr. Harrison, Ms. Duprey's coemployee, that:

> "Dr. Harrison was an employee of Dr. Shane. Most of his arguments are predicated on the theory that Dr. Shane, as employer, is not liable for malpractice and that he, as an employee of Shane, should not be liable. Independently of the liability of Dr. Shane, it is hard to see how Dr. Harrison is in any different position than the insurance company doctor would have been had he been called in to treat * * * [plaintiff]."

39 Cal.2d at 794–95, 249 P.2d at 15.

The rationale for the rule of *Duprey v. Shane* is that the provision of medical services by a physician imposes professional responsibilities independent of any employment relationship and falls outside the bounds of liability protection granted employers or coemployees under the exclusivity provisions of workers' compensation statutes. As noted by Justice Simon in *McCormick v. Caterpillar Tractor Co.*, 85 Ill.2d 352, 369, 53 Ill.Dec. 207, 215, 423 N.E.2d 876, 884 (1981) (Simon, J., dissenting):

> Patients and doctors have deeply rooted expectations about their roles in our system of medical care. The law, for example, by according a physician-patient privilege, recognizes the relation as unusually important and gives it special protection. Doctors are professionals, who en-

courage patients to have trust and confidence in them; if the doctor blunders or is disloyal, the doctor and not the patient will pay, at least in money.

The majority summarily dismisses the independent contractor analysis of the Indiana Court of Appeals in *Ross v. Schubert,* 180 Ind.App. 402, 388 N.E.2d 623 (1979). Its reasoning, however, differs from the doctrine of "dual capacity" only in semantics. As the court in *Ross v. Schubert,* 180 Ind.App. at 409, 388 N.E.2d at 629 noted, "Regardless of the extent of their affinity with the corporation, these physicians were not under the corporation's control when they exercise their professional skills. Their professional status and concomitant freedom to exercise discretion in their medical treatment prevented the corporation from controlling their actions." This is merely another way of saying that the relationship between a company doctor and an employee for purposes of medical treatment is purely professional. The court further observed in *Ross v. Schubert,* 180 Ind.App. at 410, 388 N.E.2d at 629:

> The liability of these physicians arose from their independent exercise of medical judgment, that is, it arose from their doctor-patient relationship with Ross and not from the employer-employee relationship which the Act was designed to regulate. We have not permitted physicians to escape liability by working for hospitals or forming medical corporations, and it is our opinion that the Workmen's Compensation Act was, likewise, never intended to abrogate the rights of an employee who stands in the shoes of a patient, from suing a doctor who treats him.

*See also Stevens v. Kimmel,* 180 Ind.App. 187, 190–91, 394 N.E.2d 232, 234 (1979). Finally, the Indiana Court of Appeals noted the same inconsistencies and undesirable consequences cited by the court in *Duprey v. Shane:*

> This court is not persuaded that we should sanction protection of company physicians while at the same time hold liable independent physicians who provide identical services. In either circumstance, the liability arises because of

medical judgment. Where that judgment is exercised, i.e., upon the company's premises as opposed to the physician's private office, should not be the determinative factor as to whether or not an individual may bring an action for medical malpractice since in both instances, the physician controls the manner of medical treatment. To hold otherwise would encourage the company physician to be less assiduous.

180 Ind.App. at 410, 388 N.E.2d at 629; *see also Stevens v. Kimmel,* 182 Ind.App. at 191, 394 N.E.2d at 234; *Duprey v. Shane,* 39 Cal.2d at 791, 249 P.2d at 14, *quoting Smith v. Golden State Hospital,* 111 Cal. App. 667, 672, 296 P. 127, 129 (1931):

> " 'That independent professions by the fact of business contact with the employer should be absolved of responsibility for mistake, avoidable or unjustified neglect resulting in secondary affliction, seems obnoxious to the purpose and spirit of such a statute. To so hold might induce industry to encourage quackery, to place a premium upon negligence, inefficiency and wanton disregard of the professional obligations of medical departments of industry, toward the artisan.' "

As noted by the majority, both California and Colorado have expressly applied the doctrine of dual capacity to impose liability on company doctors for medical malpractice committed upon company employees. In *Hoffman v. Rogers,* 22 Cal.App.3d 655, 662, 99 Cal.Rptr. 455, 460 (1972), the court relied upon the seminal case of *Duprey v. Shane, supra,* noting that:

> The *Duprey* case also involved the liability of Dr. Harrison, an employee of Dr. Shane, who aided in treating the plaintiff. Implicitly the court held that the principles which imposed liability on Dr. Shane were just as applicable to his employee, Dr. Harrison....
>
> The principles expressed in the *Duprey* decision are controlling here.

Similarly, in *Wright v. District Court,* 661 P.2d 1167, 1171 (Colo.1983), the Colorado Supreme Court held that:

As its name implies, dual capacity analysis is premised on the principle that a coemployee—here Dr. Wright—simultaneously may occupy the separate statuses of an employee and of a physician licensed to practice medicine under the Colorado Medical Practice Act, *see* 12–36–101, *et seq.*, C.R.S.1973 (1978 Repl. Vol. 5 and 1982 Supp.). Because the allegedly tortious actions here took place in the course of the doctor-patient relationship and outside the scope of the employment relationship, Cobb's malpractice action is not barred by the Workmen's Compensation Act. Therefore, Dr. Wright may be liable in his capacity as a doctor,....

The fallaciousness of the reasoning of courts cited by the majority for the proposition that company doctors are coemployees for every purpose, including liability for their own acts of medical malpractice, is illustrated by the irreconcilability of their application of the dual capacity doctrine in analogous circumstances.

First, although the Pennsylvania Supreme Court held in *Budzichowski v. Bell Telephone Co.*, 503 Pa. 160, 166, 469 A.2d 111, 114, n. 5 (1983) that even "[a]ssuming, *arguendo*, that ... the 'dual capacity' doctrine ... is applicable to this case, the fellow employee immunity provided by the Act ... would remain a viable doctrine," it also held in *Tatrai v. Presbyterian University Hospital*, 497 Pa. 247, 254, 439 A.2d 1162, 1166 (1982), where a hospital employee who was directed to the emergency room for treatment after becoming ill at work suffered an injury resulting from a fall caused by a loose foot stand on an x-ray table, that:

> At the time of appellant's illness there was no doctor on duty at the Employee Health Service. Ms. Tatrai therefore went to the hospital emergency room which was open to members of the general public. The sole reason appellant went to the emergency room was for treatment of her illness. Upon her arrival to the emergency facility, Ms. Tatrai was treated as a paying patient and like any other member of the general public. Since Ms. Tatrai's presence in the emergency room was not in furtherance of the affairs of her employer and was not required by reason of her employment, we must conclude that Workmen's Compensation is not her exclusive remedy. There is no reason to distinguish appellant from any other member of the public injured during the course of treatment. The risk of injury which appellant suffered was a risk to which any member of the general public receiving like treatment would have been subjected. The occurrence of the injury was not made more likely by the fact of her employment.

Second, although a Louisiana Court of Appeal held that an employee's suit against a company physician was barred by the exclusivity provision of the workers' compensation statute in *Thomas v. Kenton*, 425 So.2d 396, 400 (La.Ct.App. 3 Cir.1982) since "[h]aving failed to allege a doctor-patient relationship, there could be no breach of duty arising therefrom ... and plaintiff, in this respect, has failed to state a cause of action," another Louisiana Court of Appeal later held in *Laugharn v. Savoie*, 480 So.2d 325, 328 (La.Ct.App. 4 Cir. 1985), where a hospital employee's thumb injury was allegedly aggravated by Dr. Savoie's malpractice, that:

> Plaintiff was employed as a medical technician, not as a patient. Her thumb got infected on the job, but the treatment she received from Dr. Savoie was not within the scope of her job. Her employment did not require her to be a patient of Dr. Savoie, nor did she receive his treatment at the behest of her employer.... Dr. Savoie had *no connection with plaintiff's* employment. His treatment was clearly outside the scope of her job as a medical technician.

Therefore, the court reversed a grant of summary judgment for Dr. Savoie, the hospital, and the state department of health based upon the exclusivity provision of the workers' compensation statute. *Laugharn v. Savoie*, 480 So.2d at 328.

Third, although the Michigan Supreme Court held in *Jones v. Bouza*, 381 Mich. 299, 302, 160 N.W.2d 881, 882 (1968) that,

"The fact that a common law action has a special name—'malpractice'—does not eliminate it from the class of injury actions for which workmen's compensation has been made the exclusive remedy," a Michigan Court of Appeals later held in *Szydlowski v. General Motors Corp.*, 59 Mich.App. 180, 183–84, 229 N.W.2d 365, 367 (1975), where the plaintiff alleged that her husband had died from cardiac arrest as the direct and proximate result of the ingestion of drugs improperly administered for a back sprain by nonphysician personnel of General Motors, that:

> Szydlowski alleges only that the strains and sprains requiring the medication ultimately resulting in death occurred during the employment. She does not allege that the medical treatment itself arose out of and in the course of employment. In addition, there is some question whether medical treatment, even assuming it satisfies the "arising out of and during the course of employment" test if properly given, satisfies that test when illegally administered.

"Since one of the 'conditions of liability' necessary to the invocation of the Workmen's Compensation Act's exclusive remedy provision is absent," the court held in *Szydlowski v. General Motors Corp.*, 59 Mich.App. at 184, 229 N.W.2d at 368, that, "her common-law tort claim is well-pled." Similarly, in *Fletcher v. Harafajee*, 100 Mich.App. 440, 445, 299 N.W.2d 53, 55 (1980), a Michigan Court of Appeals refused to apply the exclusivity provision of a workers' compensation statute in a case involving negligent treatment of a police officer by a municipal medical center, stating that, "The medical center is not a facility intended for the exclusive treatment of city employees. It was merely an unfortunate coincidence that it was utilized by plaintiff."

Fourth, although the New Jersey Supreme Court held in *Boyle v. Breme*, 93 N.J. 569, 570, 461 A.2d 1164, 1164 (1983) that, "[W]hen the Legislature added a provision for co-employee immunity to the Workers' Compensation Act in 1961, L.1961, c. 2 (codified at N.J.S.A. 34:15–8), some employers had medical clinics staffed by employee doctors and nurses. If the Legislature had intended to exclude this class of co-employees, it could have expressed that intent," it recently held in *Millison v. E.I. du Pont de Nemours & Co.*, 101 N.J. 161, 166, 501 A.2d 505, 507 (1985), where several employees had brought suit against their employer and the employer's company physicians, that "although the employees are limited to workers' compensation benefits for any initial occupational-disease disabilities related to the hazards of their employment experience, the Compensation Act does not bar plaintiffs' cause of action for aggravation of those illnesses resulting from defendants' fraudulent concealment of already discovered disabilities." *See also Downey v. Bexley*, 253 Ga. 125, 126, 317 S.E.2d 523, 524 (1984) ("Dr. Downey should not be allowed to avoid liability for alleged fraud, deceit, and abuse of professional trust merely by invoking the 'co-employee' doctrine of workers compensation law.").

Fifth, although the New York Court of Appeals in *Garcia v. Iserson*, 33 N.Y.2d 421, 423, 309 N.E.2d 420, 422, 353 N.Y.S.2d 955, 957 (1974), affirming dismissal of an action by an employee whose industrial injury was allegedly aggravated by the medical malpractice of a company doctor, held that, "Under these circumstances we conclude that plaintiff's injuries arose out of and in the course of his employment as the result of the alleged negligence of another in the same employ," in *Volk v. City of New York*, 284 N.Y. 279, 283, 30 N.E.2d 596, 597 (1940), the New York Court of Appeals had previously held that a nurse employed by a city hospital was not barred by the exclusivity provision of the workers' compensation statute from bringing an action for the loss of use of her arm following injections of a decomposed morphine solution at the nurses' infirmary for treatment of food poisoning, stating that:

> The risk of the injury which plaintiff suffered was not incidental to her employment. It was a risk to which anyone receiving like treatment would have been subjected. The occurrence of the injury was not made more likely by the fact of

her employment. Consequently, the injury did not arise out of and in the course thereof.

*See also Sivertsen v. State,* 19 N.Y.2d 698, 700, 225 N.E.2d 572, 573, 278 N.Y.S. 886, 888 (1967) (employee at state mental institution was not barred by the exclusivity provision of workers' compensation statute from bringing an action for injuries resulting from a fall from a stretcher when an arm rail snapped off while she was being carried from an employee infirmary to an ambulance); *Stevens v. County of Nassau,* 56 A.D.2d 866, 866, 392 N.Y.S.2d 332, 333 (1977) (employee at county hospital was not barred by exclusivity provision of workers' compensation statute from bringing an action for a permanently deformed right arm resulting from the allegedly negligent treatment of her wrist which she fractured in a fall on the hospital grounds).

Finally, although the Ohio Supreme Court held in *Proctor v. Ford Motor Co.,* 36 Ohio St.2d 3, 6, 302 N.E.2d 580, 582 (1973), that, "[T]he employment of appellants to staff Ford Motor Company's medical facility is not casual and without the usual course of Ford's business. Doctors Arscott and Papas are 'employees' as defined in R.C. 4123.01, and are thereby accorded the immunity from tort liability conferred by R.C. 4123.741," it held in the single syllabus of *Guy v. Arthur H. Thomas Co.,* 55 Ohio St.2d 183, 378 N.E.2d 488 (1978), that:

Where an employer-hospital occupies a second or dual capacity, as an administrating hospital, that confers upon it traditional obligations unrelated to an[d] independent of those imposed upon it as an employer, an employee injured, as a result of a violation of the obligations springing from the employer-hospital's second or dual capacity, is not barred by either Section 35 of Article II of the Ohio Constitution or R.C. 4123.74, Ohio Workers Compensation Law, from recovering in tort from that employer-hospital.

In fact, the Ohio Supreme Court went on to state that, "To the extent that this instant decision bases liability upon the appellee hospital's obligations generated from its second function, unrelated to its function of an employer, a result contrary to that reached in *Proctor, supra,* is implied therefrom." 55 Ohio St.2d at 190, 378 N.E.2d at 492.

As can be seen from the foregoing discussion, six of the eight jurisdictions cited by the majority in support of the proposition that company doctors are immune from liability for acts of malpractice committed upon company employees under the coemployee exclusivity provision of workers' compensation statutes have permitted employee tort actions in analogous circumstances. Five of these jurisdictions have permitted hospital employee actions against physicians and/or hospitals for acts of malpractice committed upon those employees in the treatment of work-related injuries and illnesses. As noted by the Colorado Supreme Court in *Wright v. District Court,* 661 P.2d at 1170:

The distinction drawn is that the employee who is treated in a hospital is receiving the same services available to the public, while the employee who is seen in a company clinic is treated as an incident of employment. Under this reasoning, the former is allowed a cause of action for malpractice but the latter is barred by co-employee immunity. We are not persuaded by this distinction. It is not the *public* practice of medicine which creates a dual capacity for the attending physician; it is the very practice of medicine, with its special duties and responsibilities, which charges a doctor with all of the obligations which normally arise in the doctor-patient relationship. One's need for protection from medical malpractice is not affected by the configuration of the employment relationship or the location of treatment.

The conflicting decisions of the Michigan courts in *Jones v. Bouza* and *Szydlowski v. General Motors Corp.* are also irreconcilable. In *Jones,* where alleged malpractice in the treatment of a back injury resulted in partial paralysis, a tort action by the employee was not permitted. In *Szydlowski,* where alleged malpractice in the treatment of a back injury resulted in death, a tort action by the employee was permitted. Finally, New Jersey employees are not

barred from bringing tort actions against company physicians for "fraudulent concealment of already discovered [work-related] disabilities." *Millison v. E.I. du Pont de Nemours & Co.*, 101 N.J. at 166, 501 A.2d at 507.

One commentator has noted five reasons that coemployee immunity for company doctors does not further the recognized objectives of workers' compensation:

*Absence of fault.*—Most accidents involving fellow workers occur without fault, or at least without manifest fault. Thus, co-employee immunity is based on the assumption that workers benefit by exchanging the slight possibility of full tort recovery for the certainty of limited benefits under workers' compensation. This assumption is, however, inapplicable to injuries resulting from medical malpractice. While ordinary co-employee negligence may blend with risks inherent in the production process to make assignment of fault nearly impossible, medical negligence is easier to identify. Most often it occurs subsequent to the original injury in an area physically removed from production activity. More importantly, it can be judged in light of ascertainable standards. To the extent that the difficulty of proving fault and recovering in a negligence action justifies co-employee immunity, the justification evaporates with regard to company doctors.

*Intimate connection between the accident and the workplace.*—Workplace accidents are a concomitant of our technological era. Implicit in co-employee immunity is the recognition that most injuries inflicted by one employee upon another are due not to unreasonable conduct, but to the fact that an employer has furnished complex equipment to workers and has made demands on them. In a sense, most occupational accidents, regardless of cause, are the inevitable result of an intimacy between men and machines which is created within the employer's enterprise. When a company doctor aggravates injuries suffered previously by an employee, it is neither inevitable nor a risk that is inherent in the production process. Since the same risk

of malpractice would exist if the employee sought private treatment away from the workplace, intimate connection with the employer's enterprise is lacking.

*Efficient risk distribution.*—In situations where one employee injures another, the employer is a better risk-bearer and risk-distributor than the worker. The latter is less likely to have substantial resources from which to satisfy a judgment, is less likely to carry liability insurance, and has little ability to distribute risk through the price charged for his services. Company doctors, however, differ from conventional workers in this regard. They have higher incomes and often carry professional liability insurance.

*Existence of a quid pro quo.*—In the usual situation, co-employee tort immunity is consistent with the quid pro quo policy of workers' compensation. The risk of injuring a co-employee and the risk of being injured by a co-employee are essentially equivalent. By relinquishing the right to sue co-employees but acquiring immunity from suit, each worker partakes in a fair exchange. Because the company doctor is segregated from the production area, however, she is far less likely to be the victim of injury than she is to be its perpetrator. Thus, the doctor who acquires tort immunity partakes in an exchange heavily weighted in her favor.

*Accident deterrence.*—The final justification for the co-employee bar is accident deterrence. The employer, by virtue of his ability to select, train, assign, oversee, and discipline workers and his ability to organize the enterprise in a safety-conscious manner, is best able to prevent accidents. The threat of liability provides direct monetary incentive to do so. Employer liability presumes that the employer exercises substantial control over the workplace and the workforce. Since the employer lacks significant control over professional acts of the company doctor, there is little deterrent effect in holding him liable for medical accidents.

Note, *The No-Duty Rule in New York: Should Company Doctors Be Considered*

*Co-Employees?*, 9 Hofstra L.Rev. 665, 675–77 (1981) (Footnote omitted); *see also Wright v. District Court*, 661 P.2d at 1170–71.

The majority's brief dismissal of these five factors in footnote thirteen is unconvincing. First, with respect to the point that medical malpractice is palpably different from the ordinary negligence associated with industrial injury, the majority responds that it is no different than the ordinary negligence of office workers who cause industrial injury. Aside from the obvious fact that bookkeeping error poses a substantially lesser threat to the health and welfare of workers than does the provision of medical treatment, a higher threshold of recovery exists with respect to malpractice as opposed to the ordinary negligence of an office worker. Second, with respect to the point that the provision of medical care has, at best, an indirect impact upon the production process, while ordinary industrial accidents occur during the production process, the majority responds that malpractice is at least as related to production as is parking on the company parking lot. Aside from the obvious fact that access is an absolute prerequisite to production, while submitting to medical treatment ordinarily is not, an employer has far less control over the conduct of physicians in company dispensaries than it has over traffic flow in a company parking lot. Third, with respect to the point that physicians, unlike ordinary employees, are normally insured specifically for actions committed during the course of employment which result in injury to others, the majority offers no real response. The need for professional malpractice insurance is a function of the heightened risk of harm associated with the practice of a skilled profession. It is unlikely that many insurance policies are written for the potential professional liability of bookkeepers or secretaries or janitors. Fourth, with respect to the point that a company doctor gives up very little risk in exchange for substantial immunity, the majority again notes that office workers are less at risk of injury through the negligence of fellow workers than are those involved directly in the pro-

duction process. Certainly, office workers give up very little risk in exchange for their immunity. In turn, however, they pose substantially less risk to their fellow workers. Company doctors give up little, and get a great deal. Office workers give up little, and get an essentially equivalent amount. Finally, with respect to the point that it is more difficult for an employer to deter medical malpractice as opposed to injuries resulting from hazards in the workplace, the majority responds that increased workers' compensation premiums increase the incentive for employers to respond to industrial injury regardless of the cause. This response misses the point. Certainly, the incentive for action might be the same, but even if the employer desired to reduce the incidence of medical malpractice committed, it would lack the expertise or authority to effectuate this goal. It is unlikely that an employer would be successful in ordering a company doctor to "Practice better medicine" or "Don't commit malpractice."

The only practical consideration noted by the majority in this case in support of application of the coemployee immunity provision to company physicians is that application of the "dual capacity" doctrine would discourage employers from maintaining onsite dispensaries, to the detriment of the employees' health. In fact, the reverse would most likely be true. Not holding company doctors financially liable for acts of malpractice which aggravate industrial injury would actually increase their employers' financial burden through increased workers' compensation premiums. Where a company doctor's negligent treatment of three broken toes resulted in full amputation of an employee's leg, as in *Mager v. United Hospitals*, 88 N.J.Super. 421, 212 A.2d 664 (1965), immunization of the physician would result in payment of workers' compensation benefits for the loss of the leg, while nonimmunization would result in payment of workers' compensation benefits for only the three broken toes. Obviously, refusal to apply the doctrine of "dual capacity" to company doctors significantly increases an employer's risk of substantially greater workers' compensation claims. The primary purpose of on-site medical fa-

cilities is the minimization of industrial injury. It is unlikely that imposition of liability on company physicians staffing those facilities would have an appreciable impact on their provision. There is no evidence of record of massive closure of company dispensaries in California, Colorado, and Indiana, where the doctrine of "dual capacity" is applied to company doctors.

The majority opinion ignores the everyday realities of the workplace. As noted by Justice Simon, dissenting in *McCormick v. Caterpillar Tractor Co.*, 85 Ill.2d at 371, 53 Ill.Dec. at 215, 423 N.E.2d at 884:

> Medical malpractice is not an inherent risk of the tractor business.... It is a feature of medical practice, and its costs should be borne by the medical profession.... The legislature has not seen fit to pass a Patients' Compensation Act. This court should not, in effect, provide the practitioners of one medical speciality, industrial medicine, with a no-fault malpractice scheme.... When an employee is hired, he assumes the risks and hazards of employment that naturally flow from that employment. The risks he accepts should not be extended to those not really incident to the employment, like the risk of medical mistreatment.

On a more human level, Justice Simon observed in *McCormick*, 85 Ill.2d at 376, 53 Ill.Dec. at 217–18, 423 N.E.2d at 886–87:

> McCormick probably felt like a patient rather than an employee. If someone had asked what he was doing at the clinic, neither McCormick nor anyone else would have said, "working." The doctors probably felt like doctors: they did not go to school all those years to become Caterpillar employees, and when strangers ask them what they do they probably do not say they are employees of Caterpillar.

Industrial medicine, like any form of emergency medicine, has not only the potential of doing the most good, it also has the potential of doing the most harm. Unlike others seeking treatment, individuals in need of emergency medical care are often not only victims of serious or even life-threatening injury, they are often victims of circumstances. They are not in a position to choose the provider of their health care. Rather, they must depend upon the

competent execution of the medical judgment of those who happen to be on duty. Furthermore, in the industrial setting, work rules often mandate resort to the company dispensary even in nonemergency situations. The reporters are replete with cases where simple industrial injuries have been aggravated by the blatant malpractice of company doctors into paralysis, amputation, or even death. Are our factories to become sanctuaries for incompetent practitioners of medicine who because of past quackery are unable to maintain a sufficiently lucrative private practice or obtain adequate malpractice insurance? The moral of this opinion might be expressed by the working people of this State as, "[Company] '[p]hysician, heal thyself,' but stay away from me." *See Luke* 4:23. Sharing this sentiment, I must dissent.