Blanche SMITH, Administratrix of the Estate of William E. Smith, deceased, Plaintiff,

v.

MONSANTO COMPANY, a Delaware corporation, Defendant.

Civ. A. No. 2:91–0524.

United States District Court, S.D. West Virginia, Charleston Division.

Sept. 29, 1992.

W. Stuart Calwell, Charleston, WV, for plaintiff.

Charles M. Love, III, Charleston, for defendant.

### MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the motions of the defendant, Monsanto Company, for summary judgment.

#### I. *Background*

Plaintiffs, William and Blanche Smith, originally filed this action against the defendant, Monsanto Company (hereinafter "Monsanto"), on May 14, 1991. Following Mr. Smith's death on December 14, 1991, an amended complaint was filed which substituted Blanche Smith, Administratrix of the Estate of William E. Smith, in the place and stead of her deceased husband.[1]

In the amended complaint, plaintiff contends that Mr. Smith was employed by Monsanto at its Nitro, West Virginia, facility from 1945 to 1981, and that, between the years of 1945 and 1955, Mr. Smith was exposed to a chemical referred to as para-aminobiphenyl or "PAB" which was used by Monsanto in the manufacture of various

---

1. In the amended complaint, no cause of action has been asserted by Blanche Smith in her individual capacity.

chemical products. *See* Complaint at ¶ 4.[2] According to the complaint, Mr. Smith developed bladder cancer in approximately November, 1989, as a direct result of PAB exposure.

Factually, there is no dispute between the parties that PAB was an important chemical utilized in the manufacture of such products as Ajone–C and Santoflex–B at Monsanto's Nitro, West Virginia plant from the 1930's until approximately July 1, 1955. PAB was manufactured by Monsanto at its Queeny and Krummick plants in St. Louis, Missouri, and was shipped by tank cars to the Nitro plant where it was utilized in the manufacture of Ajone–C and other PAB–containing products.

In Count I of the amended complaint, plaintiff asserts that, sometime prior to October, 1953, Monsanto became aware that employees who were exposed to PAB were at a high risk of developing bladder cancer. As a result, Monsanto commenced a medical monitoring program (hereinafter "PAB program") in approximately 1952 in order to detect precancerous conditions in individual employees before the condition reached an "invasive" or "frank" stage. Plaintiff alleges, however, that Monsanto was negligent in its operation of the PAB program and never notified Mr. Smith of the program and the opportunity for medical monitoring. *See* Amended Complaint at ¶ 8. Plaintiff contends that, as a result of Monsanto's alleged negligence, Mr. Smith's cancer was not detected until it had reached an invasive stage.

In Count II of the amended complaint, plaintiff alleges that Monsanto acted with deliberate intention to cause William Smith's injuries and death inasmuch as Monsanto had knowledge of a high degree of risk and strong probability that exposure to PAB could cause serious injury, and, nonetheless, continued to expose him to that hazard. *See* Amended Complaint at ¶ 16. Moreover, plaintiff contends, prior to 1955, Monsanto had a subjective realization and appreciation of the existence of a specific unsafe working condition at the Monsanto workplace, namely, the opportunity for exposure to PAB. Plaintiff asserts that the opportunity for employee exposure to that chemical at Monsanto's Nitro plant prior to its cessation of the production of PAB in 1955 was in violation of commonly accepted and well known safety standards applicable to the use of and exposure to known bladder carcinogens. *Id.* at ¶¶ 17–19.

Monsanto has filed separate motions for summary judgment on each of the two substantive counts of plaintiff's complaint. With respect to Count I, Monsanto argues that the allegations of negligence asserted with respect to its operation of the PAB program fail as a matter of law due to the statutory immunity afforded employers from negligence based causes of action under W.Va. Code § 23–2–6. With respect to Count II, Monsanto contends that the plaintiff has failed to introduce sufficient evidence on one of the five requisite elements of proof of "deliberate intention" under W.Va.Code § 23–4–2(c)(2).

## II. *Analysis*

Chapter 23 of the West Virginia Code removes from the common law tort system "all disputes between ... employers and employees regarding compensation to be received for injuries or death. *See* W.Va.Code § 23–4–2(c). This result is achieved by virtue of section 23–2–6 of West Virginia's Workers' Compensation Act (hereinafter "the Act") which provides statutory immunity from suit for those employers who either subscribe to the West Virginia Workers' Compensation Fund (hereinafter "the Fund") or elect to be a self-insurer and comply fully with the requirements of the Act. The provision of the Act conferring employer immunity expressly states:

> Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided shall not be liable to respond in

---

**2.** Para-aminobiphenyl is also known as para-aminodiphenyl. It may also be referred to as 4–aminodiphenyl, 4–aminobiphenyl, xenylamine, and p-biphenylamine. *See generally Encyclope-* *dia of Occupational Health and Safety,* p. 143 (Int'l Labor Office, Geneva) (3d ed. 1983) (affixed as Attachment A to plaintiff's response in opposition to motion for summary judgment).

damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter.

W.Va.Code § 23–2–6.

West Virginia's Supreme Court has recognized that the legislative immunity afforded employers by the Act is "designed to remove *negligently* caused industrial accidents from the common law tort system," see *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 246 S.E.2d 907, 911 (1978) (emphasis in original), and that "the benefits of this system accrue to both the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the employee, who is assured prompt payment of benefits." *Meadows v. Lewis*, 172 W.Va. 457, 307 S.E.2d 625, 638 (1983).

■ Under the Act, an employer who is otherwise entitled to immunity under § 23–2–6 may lose that immunity in only one of two ways: (1) by defaulting in payments required by the Act or otherwise failing to comply with the provisions of the Act, *see* W.Va.Code § 23–2–8, or (2) by deliberately intending to produce injury or death to the employee. *See* W.Va.Code § 23–4–2. It is against this statutory framework that the propriety of Monsanto's motions for summary judgment with respect to both Counts I and II must be considered.

A. *Motion for Summary Judgment on Count I*

As noted previously, Count I is predicated upon allegations of negligence on the part of Monsanto in its administration of the PAB program. In support of its motion, Monsanto has tendered an affidavit certifying its good standing with the Fund and its compliance with the requirements of the Act at all times during the pendency of William Smith's employment. *See* Affidavit of Gretchen O. Lewis, attached as Exhibit A to Monsanto's motion for summary judgment on Count I (hereinafter "Lewis affidavit"). Plaintiff has not submitted a counter-affidavit or other evidence to refute the averments in the Lewis affidavit, nor otherwise contested the accuracy of the factual assertions therein. Consequently, inasmuch as W.Va.Code § 23–2–6 confers statutory immunity from common law negligence action upon employers who are in good standing with the Fund and have otherwise complied with the requirements the Act, Monsanto contends that there is no genuine issue of fact to preclude the granting of summary judgment in its favor on the negligence claims asserted by the plaintiff in Count I.

In an effort to overcome Monsanto's statutory immunity from negligence based causes of action, plaintiff seeks to invoke the "dual capacity" or "dual persona" doctrine, arguing that Monsanto's implementation of the PAB program went beyond the confines of the employer-employee relationship and established a relationship akin to that of physician-patient.

■ The "dual capacity" or "dual persona" doctrine is a legal fiction applied by some courts which have held that an employer may, in effect, become "a third person," vulnerable to a tort suit by an employee notwithstanding the statutory immunity otherwise owing to the employer under state compensation laws but "if—and only if—he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person." *See Deller v. Naymick*, 176 W.Va. 108, 342 S.E.2d 73, 78 (1985) (citing 2A A. Larson, *The Law of Workmen's Compensation*, § 72.81 (1983) and cases cited therein).

In *Deller v. Naymick*, West Virginia's Supreme Court considered and rejected the dual capacity doctrine in a case in which an injured employee brought a negligence based cause of action against a company physician. The court concluded that the company physician was an "employee" within the meaning of the Act and that the immunity from tort liability provided to employees under W.Va. Code § 23–2–6a (1949) is "the same as the immunity from tort liability provided by W.Va.Code § 23–2–6 (1974) to an employ-

er." [3] In declining to "carve out an exception" to that immunity under the facts before it, the *Deller* court noted that "the legislature, not this Court, is the appropriate tribunal for deciding this fairly debatable issue," and that, by not excepting doctors or other professional employees from the statutory immunity afforded by the Act, "the legislature has decided the issue in favor of immunity." 342 S.E.2d at 77–78.

Plaintiff contends that the rationale and holding in *Deller* was limited to situations involving negligence actions against co-employees who are entitled to statutory immunity under W.Va.Code § 23–2–6a and is not dispositive of the applicability of the dual capacity doctrine in cases where the negligence action has been asserted against an employer. According to plaintiff, *Deller* "opens the door to liability actions against the employer, where the employer's relationship to the employee truly falls outside the normal course and scope of employment."

■ Although *Deller* did not specifically resolve the applicability of the dual capacity or dual persona doctrine in cases such as this in which the negligence action is asserted against the employer rather than a co-employee, the rationale underlying that decision leads the court to conclude that the same result logically obtains here. As did the company physician in *Deller* pursuant to the employee immunity provisions of W.Va.Code § 23–2–6a, Monsanto has demonstrated its entitlement to statutory immunity from negligence causes of action as an employer in good standing under the express provisions of W.Va.Code § 23–2–6. That Monsanto undertook a medical monitoring program in an effort to detect urologic abnormalities in its employees does not, except through the application of a legal fiction, change Monsanto's identity or capacity as that of employer.[4] Moreover, sound public policy reasons militate in favor of the rejection of the dual capacity doctrine under the facts presented inasmuch as it is doubtful that employers such as Monsanto would voluntarily undertake to establish such beneficial employee medical monitoring programs if, by doing so, they would face the prospect of losing their statutory immunity from suit.

Inasmuch as West Virginia's legislature has specifically enunciated the limited circumstances in which an employer will lose its entitlement to immunity from civil suit under § 23–2–6, and inasmuch further as the Act plainly entitles an employer in good standing to immunity from actions premised upon allegations of negligence, the court declines, as did the court in *Deller*, to invoke a legal fiction in order to circumvent that statutory immunity. There being no genuine issue of fact presented with respect to Monsanto's entitlement to immunity from plaintiff's claims which are predicated upon allegations of negligence, Monsanto's motion for summary judgment on Count I will be granted.

## B. *Motion for Summary Judgment on Count II*

In Count II of the amended complaint, plaintiff has predicated her claim for damages against Monsanto upon the "deliberate intention" exception to employer immunity under West Virginia's workers' compensation laws. *See* W.Va.Code § 23–4–2(c)(2). Under that exception, a cause of action will lie against the employer if the injury or death to an employee resulted from the "deliberate intention of his employer to produce such injury or death." *Id.*

In 1978, West Virginia's Supreme Court held in *Mandolidis v. Elkins Industries,* that deliberate intention "must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or willful, wanton, and reckless misconduct." 246

---

3. W.Va.Code § 23–2–6a provides that the immunity from liability set forth in § 23–2–6 for employers "shall extend to every officer, manager, agent, representative or employee of such employer when he is acting in furtherance of the employer's business and does not inflict an injury with deliberate intention."

4. In rejecting the dual capacity doctrine under the facts before it, the *Deller* court cited favorably to one treatise which has criticized the doctrine on the basis that "legal fictions have no place in the interpretation of detailed modern statutes, such as compensation acts." 342 S.E.2d at 78, n. 9 (citing 2A, A. Larson, *The Law of Workmen's Compensation,* § 72–81 (1983)).

S.E.2d 907, 914 (W.Va.1978). In 1983, West Virginia's legislature amended the compensation statute in order to modify the standard of proof for deliberate intention adopted by West Virginia's Supreme Court in that case.

In amending the statute, West Virginia's legislature expressly recognized that the immunity provided under § 23–2–6 "is an essential aspect of this workmen's compensation system," and that, by amending the statute, the legislature intended "to create a legislative standard for loss of that immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct." See W.Va.Code § 23–4–2(c).

■ Under the statute as amended, two methods of proving deliberate intent exist. See W.Va.Code § 23–4–2(c)(2) (1985). First, an employer may be held liable for the injury or death to an employee if the employer acts "with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to the employee." W.Va.Code § 23–4–2(c)(2)(i).[5] Alternatively, deliberate intention on the part of the employer may be shown if the trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that each of the following five facts are proven:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong possibility of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

See W.Va.Code § 23–4–2(c)(2)(ii)(A)–(E) (1985). See also Mayles v. Shoney's, Inc., 185 W.Va. 88, 405 S.E.2d 15, 19 (1990).

In this case, plaintiff attempts to prove deliberate intention on the part of Monsanto by utilizing the second method of proof set forth in § 23–4–2(c)(2)(ii). Under that method, if plaintiff fails to introduce sufficient evidence to create a question of fact on any one of the five requisite elements, then Monsanto's motion for summary judgment must be granted. As this court has previously observed, "the statute leaves no room for flexibility; the Legislature intended all five facts to be proven." Greene v. Carolina Freight Carriers, 663 F.Supp. 112 (S.D.W.Va. 1987).

In its motion for summary judgment on Count II of the amended complaint, Monsanto focuses upon the alleged inadequacy of proof relative to the third prong of the five part test of W.Va.Code § 23–4–2(c)(2)(ii). According to Monsanto, the plaintiff has not and cannot establish that the alleged specific unsafe working condition, namely employee exposure to PAB and PAB containing products, was in violation of a state or federal safety statute, rule or regulation, or in violation of a commonly accepted and well-known safety standard within the industry or busi-

---

5. This method of proof requires a showing of actual, specific intent and "may not be satisfied by allegation of proof of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct." W.Va.Code § 23–4–2(c)(2)(i).

ness of Monsanto which was "specifically applicable" to the particular work or working condition involved. *See* W.Va.Code § 23–4–2(c)(2)(ii)(C).

In support of its position, Monsanto points out that the Fourth Circuit held in *Handley v. Union Carbide* that "it would be rare that a 'commonly accepted and well-known' safety standard could be established by showing that it exists in only one facility." 804 F.2d 265, 273 (4th Cir.1986). Asserting that Monsanto was the sole producer of PAB at all times relevant and that the plaintiff has not identified any violation of a specific industry standard which was commonly accepted and well known as required by § 23–4–2(c)(2)(ii)(C), Monsanto contends that its motion should be granted.

Plaintiff contends, on the other hand, that the evidence of record reflects the existence of an industry safety standard during the relevant period of time, recognized by chemical handlers and manufacturers world-wide, pertaining to the handling of the aromatic amines class of chemicals of which PAB is a member. Plaintiff specifically asserts that Monsanto's use and manufacture of PAB was deviant with respect to that industry-wide standard "which deplored the use, in manufacturing, of the most potently carcinogenic aromatic amines, except under the most stringent precautions, providing for no exposure to PAB-laden dust, fumes and no skin contact with PAB-laden product." *See* Plaintiff's brief in response to Monsanto's motion for summary judgment, at p. 9–10.

In resolving the issue of whether plaintiff has introduced sufficient evidence to support her contention that Monsanto's use or handling of PAB at the Nitro plant was a violation of a commonly accepted and well-known safety standard within the chemical industry

which was "specifically applicable to the particular work and working condition involved," it is helpful to briefly consider the knowledge gained by the scientific community relative to the health risks posed by industrial exposure to certain carcinogenic aromatic amines, including PAB or 4–aminodiphenyl, prior to Monsanto's cessation of the production and use of the chemical in 1955.

(a) *Carcinogenicity of Aromatic Amines, Including PAB/4–Amino diphenyl, and Occupational Bladder Cancer*

Scientific study into the problem of occupational tumors of the urinary bladder can be traced to as early as 1895 when the German surgeon, Rehn, reported what he considered to be an undue incidence of bladder tumors in men employed in the manufacture of magenta. *See* R. Case, M. Hosker, D. McDonald, J. Pearson, "Tumours of the Urinary Bladder in Workmen Engaged in the Manufacture and Use of Certain Dyestuffs in the British Chemical Industry," 11 *Brit.J.Industr.Med.*, 75 (1954). From his early inquiry into the problem, Rehn postulated that aniline, a member of the "aromatic amines" class of chemicals, was the most suspicious of the substances utilized in the manufacture of magenta.[6]

In the years following Rehn's report, further research was conducted into the problem of occupational bladder cancer and the various chemicals which were believed to be associated with an increased risk of the disease. 11 *Brit.J.Industr.Med.*, at 75. Early research into the problem culminated in 1954 when R. Case, in collaboration with other British scientists, published a comprehensive report pertaining to a five year field survey of industrial bladder cancer conducted between 1948 and 1953 in selected British

---

**6.** "Aromatic amines" are defined as "compounds consisting of a cyclic hydrocarbon radical (phenyl-, diphenyl-, naphthyl-, tolyl-, xylil-, etc. groups) which replaces one or several hydrogen atoms in an ammonia molecule." *See* W.C. Hueper, *Occupational Tumors and Allied Diseases*, 476 (1942). The author of that text further observes:

Aromatic amines may, on the other hand, be considered as uni-or polycyclic hydrocarbons with substitutions on one or several hydrogen

atoms attached directly to a ring carbon atom by amino-groups ($-NH2$). The position of the substitution is designated by the terms ortho-, para-, or meta-. The simplest representatives of this group of aromatic compounds are aniline ... and its homologues, toluidine and xylidine.

*Id.* *See also Encyclopedia of Occupational Health & Safety* (Int'l Labor Office, Geneva) (3d ed. 1983) (affixed as Attachment A to plaintiff's response in opposition to motion for summary judgment).

chemical factories. (hereinafter "Case report"). The five-year field survey upon which the case report was based was undertaken at the instance of the Association of British Chemical Manufacturers and was funded by twenty of its member firms, including British-based Monsanto Chemicals, Limited, who were "directly concerned with the manufacture of the chemicals in question." *See* Booklet, *Papilloma of the Bladder in the Chemical Industry* (Ass'n British Chemical Manufacturers) (Nov.1953) at p. 2; 14 *Brit.J.Industr.Med.* at 150 (1957); 11 *Brit.J.Industr.Med.* at 75 (1954).

In the Case report, the authors observed that numerous studies had been conducted relative to occupational bladder cancer in Great Britain, Germany, Japan, Switzerland, France, Italy and America subsequent to the Rehn report, with those studies resulting in unanimity of opinion only about the carcinogenicity of one aromatic amine, B-naphthylamine, which the authors noted "has been generally accepted as a cause of human bladder cancer." *See* Case study, 11 *Brit.J.Industr.Med.* at 75.[7] *See also* T.S. Scott, "The Control of Occupational Cancer of the Bladder," at pp. 309–10 (1953) (Affixed as Attachment G to plaintiff's response in opposition to motion for summary judgment). The Case study was, therefore, undertaken in an effort to definitively ascertain whether the manufacture or use of not only B-naphthylamine, but also aniline, benzidine, and alpha-naphthylamine, produced tumors in men so engaged.[8]

Case and his collaborators determined from the results of their five-year study between 1948 and 1953 that occupational exposure to the aromatic amines benzidine, b-naphthylamine, and a-naphthylamine, in either manufacture or use, "causes many more bladder tumors in workmen so exposed than would appear if no special risk was operating." *See* Case report, at p. 95.[9] The report further noted that, with respect to those aromatic amines, "b-naphthylamine has been the most potent cause of occupational bladder tumors between 1915 and 1951." *Id.*

The results of the Case study, which the literature recognizes as having produced definitive statistical proof that contact with the aromatic amines alpha-naphthylamine, beta-naphthylamine, and benzidine caused a significant increase in the incidence of bladder tumors among men who were associated with the manufacture and use of those chemicals, were "at once" provided to the Ministry of Pensions and National Insurance. *See* T.S. Scott, M.H.C. Williams, "The Control of Industrial Bladder Tumors: A Code of Working Practice Recommended by the British Dyestuffs Industry for the Manufacture and Use of Products Causing Tumors of the Bladder," 14 *Brit.J.Industr.Med.,* 150 (1957).[10] Although the results of the Case study were published in 1954 in an article authored by Case and his collaborators, *see* "Tumours of the Urinary Bladder in Workmen Engaged in the Manufacture and Use of Certain Dyestuffs ...," 11 *Brit.J.Industr.Med.* at 75 (1954), the research project and the results thereof were earlier discussed in a booklet circulated by the Association of British Chemical Manufacturers to "managements, trade unions and workmen" in 1953. *See* 14 *Brit.J.Industr.Med.* at 150, and booklet entitled "Papilloma of the Bladder in the Chemical Industry," (Ass'n of British Chemical Manufacturers) (Nov.1953). The 1953 booklet specifically noted, as did the Case report, that Case and his co-workers had, following their five-year study, been able to "say with confidence that occupational

7. B–Naphthylamine, an aromatic amine, is also known and referred to in the literature as "beta-naphthylamine," and "2–naphthylamine." *See Encyclopedia of Occupational Health and Safety,* (Int'l Labor Office, Geneva) (3d ed. 1983).

8. Aniline, benzidine, and alpha-naphthylamine are all, like b-naphthylamine, members of the aromatic amines class of chemicals. *See Encyclopedia of Occupational Health and Safety,* (Int'l Labor Office, Geneva) (3d ed. 1983) at pp. 143–45.

9. No evidence was found from the Case study to inculpate aniline as a carcinogen.

10. As a result of the conclusions reached by Case and his collaborators, the United Kingdom prescribed bladder cancer as an industrial disease in 1953 in occupations associated with the use and manufacture of those chemicals. 14 *Brit.J.Industr.Med.,* 150 (1957).

exposure to [alpha-naphthylmine, beta-naphthylamine and benzidene] causes an increased death certification of tumour of the bladder." *Id.* at 5. Other aromatic amines, namely magenta and auramine, were also noted in the 1953 booklet to have shown a "statistically significant excess of bladder tumour death certificates." *Id.*

That the attention of the scientific community had been focused long before the Case report and the 1953 booklet upon the aromatic amines as possible etiological agents in the development of urogenic tumors is reflected in one 1942 text which opined that "all aromatic amines, with the exception of the sulfonated aminoanthroquinones and the more complex derivatives, irritate the bladder and therefore are suspected of possessing carcinogenic qualities." *See* W.C. Hueper, *Occupational Tumors and Allied Diseases*, (C.C. Thomas, 1942) at p. 480 (affixed as Attachment D to plaintiff's memorandum in response to Monsanto's motion for summary judgment). Moreover, that the three aromatic amines inculpated by the Case study were not the only aromatic amines suspected as being carcinogenic is apparent from the Case report itself which observed in 1954 that, "[t]here is some evidence that work in the chemical industry which does not involve contact with [benzidine, a-naphthylamine and b-naphthylamine] may cause earlier deaths from bladder tumour than occur in the general population." *See* Case report, 11 *Brit.J.Industr.Med.* at 95.[11]

Particularly significant is the fact that, during the early 1950's and at the same time as the Case study was underway, suspicion was also being focused upon the specific chemical structure at issue here, 4–aminodiphenyl. In 1952, three years prior to Monsanto's cessation of the production and use of PAB, published research by Walpole and associates suggested that 4–aminodiphenyl "played a part, together with B-naphthyla-

mine and other high boiling aromatic amines, in the genesis of some of the bladder tumors in dyestuff workers which occurred in Germany during the early years of this century." A.L. Walpole, M.H.C. Williams, D.C. Roberts, "Tumors of the Urinary Bladder in Dogs After Ingestion of 4-Aminodiphenyl," 11 *Brit.J.Industr.Med.*, at 105 (1954). In their published 1952 report, Walpole, Williams and Roberts noted that animal studies had been conducted which demonstrated the tumor producing potential of 4–aminodiphenyl and that "in view of this possibility, we suggest that the manufacture of 4–aminodiphenyl for industrial use should be carried out only with the most stringent precautions." 9 *Brit.J.Industr.Med.* at 260.

Subsequently, and again reiterating the results of their 1952 study, Walpole and his associates reported in 1954 that 4–aminodiphenyl "is at least as active as a bladder carcinogen in the dog as B-napthylamine," an aromatic amine which the Case report noted that same year had been the "most potent cause of occupational bladder tumours between 1915 and 1951." *See* 11 *Brit.J.Industr.Med.* at 109; *see also* 11 *Brit.J.Industr.Med.* at ' 95. Moreover, the authors opined, 4–aminodiphenyl was "considerably more potent than benzidine...." *Id.* at 109. Again, based upon these conclusions, Walpole and his collaborators cautioned that "[4–aminodiphenyl's] manufacture and use at the present day, if undertaken without adequate precautions, would involve a hazard to those concerned." *See* A.L. Walpole, M.H.C. Williams, D.C. Roberts, "Tumors of the Urinary Bladder in Dogs After Ingestion of 4-Aminodiphenyl," 11 *Brit.J.Industr.Med.*, at 105 (1954).[12] *See also* "Carcinogenic Action of 4-Aminodiphenyl ...," 9 *Brit.J.Industr.Med.* at 255–263 (1952), by the same authors.

Unlike the United States where 4–aminodiphenyl/PAB had been manufactured since

**11.** For example, Case and his co-workers reported suspicions relating to the manufacture of magenta (fuchsine) and auramine, while noting that aniline "does not appear to present a hazard." *See* 11 *Brit.J.Industr.Med.* at 93.

**12.** "4–Aminodiphenyl" referenced in the Walpole study is also known as 4–aminobiphenyl, p–bi-

phenylamine, and xenylamine. *Encyclopedia of Occupational Health and Safety*, at 143 (Int'l Labor Office, Geneva) (3d ed. 1983), (affixed as Attachment A to plaintiff's memorandum in opposition to motion for summary judgment) and, as previously noted, is the same substance as para-aminobiphenyl, or PAB, at issue here.

1938, the British chemical industry determined not to even begin the manufacture of PAB, apparently on the basis of the 1952 Walpole study and report which found 4–aminodiphenyl to be at least as potent a carcinogen as beta-naphthylamine. In the article, "Moral Responsibility and Dangerous Chemicals," T.S. Scott commented specifically upon the impact which the Walpole conclusions had upon the British chemical industry's decision not to commence production of the chemical:

> Much has been said of giving up compounds because safer alternatives could be used or because they were found to be too dangerous after their toxicity to workmen had been proved by tragic experience. A few have been found to be so dangerous that their contemplated manufacture was not started ... In [one] instance a manufacture was never started in Britain because its danger was proved before it could be begun. Walpole, Williams and Roberts ... working with experimental animals, demonstrated in 1952 that xenylamine was at least as potent a carcinogen as beta-naphthylamine. It was being made and used in the U.S.A. as a rubber chemical. They warned of the danger of tumours arising in men exposed to it and recommended that its manufacture should not be contemplated in this country. Three years later, in 1955, they were dramatically justified when a report was published of a series of cases of bladder tumour which had arisen in the men who had worked with it in the U.S.A. where it had been manufactured since 1938. It has now been given up there but many years must elapse before the final toll of tumors in these workmen is known. We are fortunate that it has never been manufactured in this country.

See T.S. Scott, "Moral Responsibility and Dangerous Chemicals," 57, 63 (1958) (affixed as Attachment I to plaintiff's memorandum in opposition to motion for summary judgment).[13]

In 1957, Scott and Williams also recognized that the conclusions reached by Walpole and his collaborators as early as 1952 regarding the carcinogenicity of 4–aminodiphenyl rendered the manufacture of the chemical prohibitive, stating in pertinent part:

> 4–Aminodiphenyl (referred to as xenylamine in the U.S.A.) has never been manufactured in Great Britain because experiments in rats and dogs demonstrated its carcinogenicity before its proposed manufacture (Walpole, Williams, and Roberts, 1952, 1954). Subsequently, Melick, Escue, Naryka, Mezera and Wheeler (1955) confirmed the existence of an industrial hazard in a report of tumors in men engaged in its manufacture in the U.S.A. Its manufacture has been discontinued there and it is recommended that manufacture should not be started in Great Britain.
>
> . . . .
>
> Beta-naphthylamine and 4–aminodiphenyl (xenylamine) should not be manufactured as no safe economical method can be devised.

See T.S. Scott, M.H.C. Williams, "The Control of Industrial Bladder Tumours," 14 Brit.J.Industr.Med., 150, 161 (1957).

From the foregoing analysis, it can be seen that, as early as 1952, and no later than 1954, 4–aminodiphenyl ("PAB" or "xenylamine")

13. Notwithstanding the firm pronouncement found in T.S. Scott's article published in 1958 as just quoted in the text with respect to the stern warning arising from the 1952 Walpole study, Dr. Scott, in his affidavit of September 1, 1992, states that the 1952 Walpole study did not yield "sufficient evidence to treat PAB as an occupational carcinogen" and that the 1954 Walpole experiments with dogs merely raised by 1954 the "suspicion that P.A.B. could be an occupational bladder carcinogen," concluding that "[t]he Walpole papers alone would not have led Monsanto to determine that P.A.B. should not have been manufactured." See Scott's affidavit at 5–6, at-tached as an exhibit to Monsanto's reply brief filed September 4, 1992. Dr. Scott further observes that by the time W.F. Melick and his co-workers confirmed in an article published in December, 1955, that PAB was an occupational bladder carcinogen, Monsanto had already ceased its manufacture of PAB. Id. at 5–7. Dr. Scott adds that "[o]nly in 1957, following the publication of W.F. Melick's article was it recommended by M.H.C. Williams and me in our revised and published code, that the manufacture of PAB be banned. We did not have sufficient reason to make such a recommendation in 1953." Id. at 7.

was reported and recognized by the chemical industry in Britain to be at least as active a bladder carcinogen as the most potently carcinogenic aromatic amine known at the time (beta- or 2–naphthylamine) and that the chemical industry was specifically cautioned by virtue of studies and reports emanating from that country no later than 1954 that, as a result of data gathered on the chemical, it should not be used or manufactured except under the "most stringent precautions."

Although the studies and reports relative to the carcinogenicity of certain aromatic amines, including PAB, originated in Britain, it cannot be logically said that the knowledge gained through such scientific efforts was realized only in that country, or that Monsanto should not be charged with an awareness of the scientific data gleaned through the British research efforts. To the contrary, the record reflects that Monsanto established and operated chemical facilities in the United Kingdom at Ruabon in North Wales commencing in 1930 and at Sunderland on Britain's North Sea prior to World War II. British-based "Monsanto Chemicals Limited," or "MCL" was designated an "operating division" in the company's 1939 organizational plan. *See*, Forrestal, Faith, Hope & $5,000, *The Story of Monsanto*, at p. 93.[14] In fact, as a likely result of the British research and reports, Monsanto has acknowledged that, in 1952, it "suspected a possible link between PAB and the development of bladder tumors," and that, by late 1952 or early 1953, Dr. R. Emmet Kelly, Monsanto's medical

director, was "able to conclude that PAB was a human carcinogen." *See* Monsanto's memorandum in support of motion for summary judgment, at p. 3.[15]

### (b) *Sufficiency of Evidence Regarding Industry Safety Standards*

In determining whether plaintiff has introduced sufficient evidence to overcome Monsanto's motion for summary judgment with regard to subsection (C) of W.Va.Code § 23–4–2(c)(2)(ii)—namely whether there was, prior to Monsanto's 1955 cessation of the production and use of PAB, a commonly accepted and well-known safety standard specifically applicable to the manufacture and use of PAB which was violated by Monsanto—it is noted that Walpole and his co-authors specifically cautioned in 1952 that, as a result of the carcinogenic potential of 4–aminobiphenyl, the substance should not be manufactured or handled in the chemical industry without "the most stringent precautions." *See* 9 *Brit.J.Industr.Med.* at 260. *See also* 11 *Brit.J.Industr.Med.*, at 109. The authors concluded more specifically:

> [The] manufacture and handling [of 4–aminodiphenyl] today would carry with it grave risks to the working population involved unless adequate precautions were taken to avoid skin contact or the inhalation of vapor or dust by the use of totally enclosed plant[s] and daily changes of clothing for the operatives.

**14.** Following World War II, a third of MCL's shares were placed on the British public market, with Edward O'Neal, who became MCL's managing director in 1946, opining regarding the sale of such shares:
> [T]his was a master stroke. It made Monsanto more a part of the country at a time when British concern about Britain was very important to the national morale. Our parent was known to be American—and it was up to us in the subsidiary to be a part of the place where we lived. The British public now had a piece of the action.

*See The Story of Monsanto*, at pp. 104–05.

**15.** It is observed that Monsanto does not, in its motion for summary judgment on Count II, focus upon the adequacy of evidence proffered by the plaintiff on any of the five requisite elements of proof under § 23–4–2(c)(2)(ii) except subsection (C), addressed in the discussion to follow. It is

seen, nonetheless, that, given the scientific information available by no later than 1954 regarding the carcinogenic potential of the aromatic amines, including PAB, and given Monsanto's acknowledged awareness of the carcinogenicity of PAB by early 1953, that sufficient evidence of record clearly exists to create a jury question on subsections (A), (B) and (D) of W.Va.Code § 23–4–2(c)(2)(ii) relative to the existence of a specific unsafe working condition at Monsanto which presented a high degree of risk and a strong probability of serious injury to employees exposed to PAB in the workplace, and relative to whether Monsanto had a subjective realization and appreciation of that risk and nonetheless continued to expose its employee, William Smith, to PAB and PAB containing products, before its cessation of the production and use of the chemical on or about July 1, 1955.

. . . .

It is concluded that this substance should not be manufactured or handled in the chemical industry without the most stringent precautions.

11 *Brit.J.Industr.Med.* at p. 109.

The industrial safety measures articulated in the 1954 Walpole report requiring the avoidance of dust, vapors and dermal contact are consistent with the averments set forth in the affidavit submitted by plaintiff of David Michaels, an Associate Professor of Epidemiology at the City University Medical School. According to Dr. Michaels' affidavit, there was during the 1950's a known and well established industry standard for the safe handling of PAB which provided for "no dust, no fumes and no skin contact." *See* Michaels' affidavit at ¶ 6, attached as an exhibit to plaintiff's response in opposition to Monsanto's motion for summary judgment.[16]

Monsanto has submitted the counter affidavit of T.S. Scott, a professor and the author of articles elsewhere noted, to refute the assertions contained in the Michaels affidavit. In his affidavit, Dr. Scott states that Monsanto's "ultimate action by 1955 to cease production of PAB were [sic] reasonable and represented prompt action under the circumstances and state of the scientific knowledge of the day. There were no industry standards in place at this time that regulated from an industrial hygiene or occupational medicine standpoint Monsanto's manufacturing processes for PAB." *See* Scott's affidavit at 7, attached to Monsanto's reply filed September 4, 1992. Scott's affidavit may, nonetheless, be viewed in light of his earlier findings and pronouncements detailed above.

In addition to the industrial hygienic measures recognized and recommended in the 1954 Walpole report pertaining specifically to the handling of 4–aminodiphenyl, it is also observed that the published literature prior to 1955 appears to have extended the recommended standards of hygienic precautions to be taken with respect to the use and manufacture of those aromatic amines which were proven to be carcinogenic by the Case study (beta-naphthylamine, alpha-naphthylamine, and benzidine) to other suspect or potentially carcinogenic aromatic amines. For example, in 1953, approximately two years before Monsanto's cessation of the use and manufacture of PAB, Scott discussed preventative and safety measures relevant to the handling of the aromatic amines in a published address to the Association of British Chemical Manufacturers. *See* T.S. Scott, "The Control of Occupational Cancer of the Bladder," at p. 313 (1953) (affixed as Attachment G to plaintiff's memorandum in response to motion for summary judgment). Scott specifically noted the following preventative and safety measures with respect to the handling of aromatic amines, without limiting his discussion to only those aromatic amines which had, by the end of the five-year field study conducted by Case and his co-workers between 1948 and 1953, been proven to be carcinogenic:

> To prevent amines remaining on the skin and being absorbed after work, full working clothing is supplied to each man and must be changed at the end of each shift and a bath must be taken ... protective clothing such as gloves, aprons, respirators and other devices are supplied according to the nature of the job. In order to keep down the time of possible contact to a minimum, the hours of work are limited and no overtime is permitted except in isolated emergencies.

*Id.* at p. 313.

Scott's articulation and recognition of these industrial safety measures deemed relevant to the handling of aromatic amines in 1953, particularly the precautionary measures requiring protective work clothing, baths, and respiratory masks, is entirely consistent with those measures later identified in Scott and Williams' 1957 article entitled, "The Control of Industrial Bladder Tumors: A Code of Working Practice Recommended by the British Dyestuffs Industry for the Manufacture and Use of Products Causing Tumors of the Bladder," 14 *Brit.J.Industr.Med.*, 150 (1957).

---

**16.** Monsanto has suggested that Dr. Michaels' affidavit "will likely be inadmissible at trial," on the basis that his background in epidemiology and sociomedical sciences are allegedly insufficient to qualify him to render an opinion regarding industry-wide standards for the chemical industry. However, no motion to strike the affidavit has been filed by Monsanto.

In their 1957 "code of industrial practice," Scott and Williams recognized that the known or suspected carcinogenic aromatic amines "enter the body by two main routes— inhalation and absorption through the skin— but ... can also be ingested." 14 *Brit.J.Industr.Med.*, at p. 154. They opined, therefore, that the "aim of all preventive measures must be to reduce to the minimum, and where possible to eliminate, all contacts be- tween operator and carcinogens." *Id.* Plant design and operation was recognized as the first and basic method of ensuring this end,[17] with the second line of defense requiring "the provision of personal protection for the work- men...." *Id.* The industrial safety and protective measures recognized in the 1957 article/"code" reiterate those same measures previously set forth in the 1953 booklet circu- lated by the Association of British Chemical Manufacturers to "managements, trade un- ions and workmen" in 1953, and in Scott's 1953 published address to the Association of British Chemical Manufacturers, namely, the provision of protective clothing and baths to prevent or minimize dermal contact and ab- sorption, and masks to control the inhalation of dust and vapors. *Id.* at p. 154.[18] *Compare with* T.S. Scott, "The Control of Occu- pational Cancer of the Bladder, at p. 313 (1953).

Although Monsanto argues that the "code of working practice" for known or suspected bladder carcinogens was not published until 1957, two years after the production and use of PAB ceased at Monsanto, it is apparent from a review of the 1957 article/"code" that the recommendations set forth by the au- thors at that time were expressly based upon recommendations earlier made to the chemi- cal industry in 1953. *See* 14 *Brit.J.In- dustr.Med.* at p. 150. Moreover, that the industrial safety measures enunciated in the 1957 "code" had actually been recommended and accepted by the chemical industry in 1953 is further bolstered by Scott's subse- quent address, "Moral Responsibility and Dangerous Chemicals," to the Association of British Chemical Manufacturers in 1958. In that address, Scott observed that a code of practice was recommended for the chemical industry in 1953 to cover the manufacture and use of certain carcinogens, explaining that:

> [T]wo doctors were invited by the Associa- tion of British Chemical Manufacturers to recommend a code of working practice for the manufacture and use of products caus- ing tumors of the bladder. They drew up a document which was accepted by the industry in 1953 as the recommended stan- dard and a shortened version was publish- ed in 1957.

*See* T.S. Scott, "Moral Responsibility and Dangerous Chemicals," at p. 64 (1958) (af- fixed as Attachment I to plaintiff's response in opposition to motion for summary judg- ment). *See also* booklet, *Papilloma of the Bladder in the Chemical Industry* (Ass'n British Chemical Manufacturers) (Nov.1953).

◼ In *Handley v. Union Carbide*, the Fourth Circuit observed that before an in- dustry safety standard as required by sub-

---

**17.** For example, design and ventilation of the buildings and plants where the chemicals were to be used and manufactured was said to be of primary importance. The authors further sum- marized:

> The isolation, sampling, weighing, distilling, drying, grinding or packaging of products and the disposal of residues can all be dangerous and measures to prevent contamination of the operators are recommended. Maintenance and cleaning of buildings, plant, and plant items can lead to serious exposure and men engaged in these operations must also be pro- tected.

*Id.* at p. 162.

**18.** Similar protective measures were recognized in one 1942 text, long before Scott and Williams were called upon to "draw up 'a code of industri- al practice' to cover known or suspected bladder carcinogens." In *Occupational Tumors and Al- lied Diseases*, it was noted in 1942 that "techni- cal methods ... to eliminate or restrict ... the free escape of fumes as well as the production of dust of aromatic amines ...," had been em- ployed in many factories in the industry to deal with the problem, as had "special regulations [for] ... controlling the procedure of repair work on apparatus used for the production of carcino- genic aromatic amines," including the wearing of special protective clothing and masks, and special protections to prevent direct dermal con- tact by the workers with the carcinogenic chemi- cals. *See* W.C. Hueper, *Occupational Tumors and Allied Diseases*, at p. 526–27 (1942) (affixed as Attachment D to plaintiff's response in opposi- tion to motion for summary judgment).

section (C) could be fairly characterized as "commonly accepted and well-known," the plaintiff must establish "at least some evidence that an equal or similar standard was in place or recognized by a business or industrial entity conducting the same or similar activities as the defendant." 804 F.2d at 273. In this case, based upon the court's independent review of the scientific articles and authorities of record, it is concluded that the plaintiff has introduced such evidence and that the scientific literature supports the conclusion that, prior to Monsanto's cessation of the production and use of PAB in approximately July, 1955, there existed a standard in the chemical industry relative to the handling of the aromatic amines which were either known or suspected to be carcinogenic, of which PAB was a recognized member. That industry standard, it is seen, required that the use and/or manufacture of such substances not be undertaken "without the most stringent precautions" and, specifically, required that hygienic precautions be taken to avoid skin contact or the inhalation of vapors and dust. In reaching this conclusion, the court finds unpersuasive Monsanto's argument that no such standard can be said to have existed inasmuch as it was the sole producer of PAB at the time in question. That Monsanto was the sole producer of PAB at the time stems from the fact that other operatives in the chemical industry had opted not even to begin the production of the chemical because "its danger was proved before [production] could be begun." *See* Scott, *Moral Responsibility & Dangerous Chemicals,* at p. 63.

## III. *Conclusion*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted only if appears from the record, considered in the light most favorable to the non-moving party, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Adickes v. S.K. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). In accordance with this standard, Monsanto, as the moving party, bears the initial burden of showing the absence of a genuine issue of fact on some essential element of plaintiff's claim which entitles it to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), where the Supreme Court observed that the burden on the moving party "may be discharged by 'showing' ... [the] absence of evidence to support the non-moving party's case," and that the moving party need not necessarily submit evidence in the form of affidavits or otherwise to demonstrate the absence of a genuine issue for trial. 477 U.S. at 325, 106 S.Ct. at 2554. West Virginia's Supreme Court recognized in one recent case arising under W.Va.Code § 23–4–2(c)(2)(ii):

> The question on a motion for summary judgment is not, ... whether the plaintiff has met the burden of proof on material aspects of his claim. It is, rather, whether a material issue of fact exists on the basis of the factual record developed to that date. The burden on a motion for summary judgment is not upon the non-moving party to show that he has developed facts which would allow him to prevail if his cause was submitted to a jury. The burden is on the moving party to show that there is no genuine issue as to any material fact in the case....

*See Beard v. Beckley Coal Mining Co.,* 183 W.Va. 485, 396 S.E.2d 447, 453 (1990). The court in *Beard* further concluded that a motion for summary judgment "should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry into the facts is not desirable to clarify the application of the law." *Id.* at 453.

When viewing the evidence of record in the light most favorable to the plaintiff, the court is unable to conclude as a matter of law that Monsanto observed the requisite industry standard by employing "stringent precautions" and implementing the necessary hygienic protections in the use and handling of PAB at the Nitro plant prior to July, 1955. The affidavit of plaintiff's expert avers that Monsanto's conduct and practices at the Nitro facility "was not in accordance with accepted industry standards." *See* Michaels affidavit, at ¶ 7. In addition, Monsanto's medical director, R. Emmet Kelly, testified in his deposition on April 14, 1988, that the

Ajone–C processing room at the Nitro plant was dusty, *see* Kelly deposition at p. 19, and, further, testified in his deposition on November 15, 1991, that the iron oxide method of chemical reduction employed by Monsanto was "a pretty sloppy procedure inherently." Kelly deposition at p. 33.[19] Monsanto has not, on the other hand, demonstrated the absence of a genuine issue of fact with regard to whether its methods of handling PAB and PAB-containing products at the Nitro plant prior to July 1955, were in accordance with the industry standard at the relevant period of time.

Because Monsanto, as the moving party, has not demonstrated the absence of a genuine issue of fact with respect to its compliance with industry standards pertaining to the use and handling of PAB and other carcinogenic aromatic amines which, the evidence indicates, existed prior to July 1955, Monsanto's motion for summary judgment on Count II of the amended complaint must be denied.

Accordingly, and for all the foregoing reasons, it is **ORDERED** as follows:

1. Monsanto's motion for summary judgment on Count I of plaintiff's amended complaint be, and the same hereby is, granted; and

2. Monsanto's motion for summary judgment on Count II of plaintiff's amended complaint be, and the same hereby is, denied.

---

**19.** Plaintiff alleges:

Ajone–C was made by reacting PAB with acetone. The molten compound was poured into pans and allowed to solidify. Crystalline Ajone–C was then sledge-hammered, fed into a grinder and pulverized into a smoother powdery, dust-like material and packaged. It should be noted that the pulverizing and packaging operations occurred in the same room, thereby allowing harmful dust to accumulate upon the exterior of the packages.
*See* Plaintiff's brief in opposition to Monsanto's motion for summary judgment, at pp. 2–3.